## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

JEFF CLAYTON KROSSE,　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Plaintiff,　　　　　)
　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　)　　　　　Case No. 13-CV-270-PJC
　　　　　　　　　　　　　　　　　　)
CAROLYN W. COLVIN,　　　　　　　　)
Acting Commissioner of the　　　　　　)
Social Security Administration,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　Defendant.　　　　　)

## OPINION AND ORDER

Claimant, Jeff Clayton Krosse ("Krosse"), pursuant to 42 U.S.C. § 405(g), requests

judicial review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying his application for disability insurance benefits pursuant to the Social

Security Act, 42 U.S.C. §§ 401 *et seq*.  In accordance with 28 U.S.C. § 636(c)(1) and (3), the

parties have consented to proceed before a United States Magistrate Judge.  Any appeal of this

order will be directly to the Tenth Circuit Court of Appeals.  Krosse appeals the decision of the

Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ

incorrectly determined that Krosse was not disabled.  For the reasons discussed below, the Court

**AFFIRMS** the Commissioner's decision.

**Claimant's Background**

Krosse was 42 years old at the time of the hearing before the ALJ on April 10, 2012.  (R. 25, 129).  He was 5' 7" tall, and he weighed about 320 pounds.  (R. 36).  He had attended some college, and he had a certificate in nursing assistance from Tulsa Job Corps Center in 1990.  (R. 37).  Krosse testified that there were periods when he did not get treatment or take prescription medications for his medical conditions because he could not afford it and he did not have insurance.  (R. 37-38).  He said that since he qualified for Medicaid in September 2010, he had been compliant in taking all medications.  (R. 38).  Krosse was using a cane on the day of the hearing.  (R. 37).  He said that he had purchased the cane himself and had not been prescribed a cane by a physician.  *Id.*

Krosse said that he could not stand for long periods of time because of his lower back and right knee.  (R. 38).  He said that he had low back pain even while sitting.  *Id.*  Krosse testified that he had injured his right knee in 1992 while working and that the physicians told him x-rays showed osteoarthritis.  (R. 38-39).  He said that the pain in his right knee had gotten worse over the years, and it was also increased by bad weather.  (R. 39).  He estimated his daily pain level for his knee at around 5 on a scale of 1-10.  (R. 39-40).  He also had problems with his hip.  (R. 40).

Krosse estimated that he could stand for about 15 minutes before the pain and spasm in his lower back would cause him to need to sit.  (R. 41).  He could sit for about 30 to 45 minutes before needing to stand.  *Id.*  He could walk for about two blocks before he would be out of breath and his low back and hips would hurt.  (R. 41-42).  Krosse thought that he could lift about 5 or 10 pounds in an 8-hour day.  (R. 43).  He thought that his low back problems were the cause of his inability to lift.  *Id.*  He could not bend over, and kneeling was hard for him.  (R. 42).

Krosse thought that his grip strength was not as strong as it had been.  (R. 42-43).  He had experienced some tendonitis in his right arm.  (R. 43).  He could probably write for 15-25 minutes before needing to take a break.  *Id.*

Krosse estimated that he slept about 6 or 7 hours a night.  (R. 44).  He had previously been on medication for sleep, but he could no longer afford it because Medicaid would not cover it.  *Id.*  He took one-hour naps about 3 or 4 times a week.  *Id.*  Krosse said that he was a diabetic, and his blood sugar levels were often uncontrolled in the 200s or 300s.  (R. 40).  This left him feeling as though he had no energy.  *Id.*  He felt tired during the day, and he did not think that he could sustain activity for 8 hours a day.  (R. 44-45).  He did not think that he could sit for 8 hours a day because of pain in his low back and hip.  (R. 45).  At the time of the hearing, he was not driving because his license had been suspended for lack of insurance.  (R. 45-46).

Krosse and his wife received assistance from a home health agency, and the aide did cleaning and cooked a lunch.  (R. 50-51).  Krosse did most of the dinner cooking and sometimes cooked breakfast.  (R. 51).  When he was cooking, he had problems with spasms and pain in his low back, and he sometimes sat down.  (R. 51-52).  Krosse went grocery shopping once a month, and he would have pain in his knee, low back, and hip.  (R. 52).  He used the grocery cart for support.  *Id.*

Krosse testified that he was getting treatment for depression at Family & Children's Services ("F&CS").  (R. 55).  Sleeplessness and fatigue were his main symptoms from his depression.  (R. 55-56).

Krosse was seen by J. Dewayne Geren, D.O. on October 19, 2007 for a follow-up visit for his hypertension and diabetes.  (R. 227).  Dr. Geren increased his Lisinopril and continued his other medications.  *Id.*  On November 26, 2007, Krosse had a high blood pressure reading, and

Dr. Geren assessed his hypertension as "less than adequately controlled." *Id.* On March 19, 2008, Dr. Geren assessed Krosse with borderline ketoacidosis in addition to his diabetes and hypertension. (R. 226). Dr. Geren sent Krosse to an emergency room for further evaluation and treatment. *Id.* Krosse saw Dr. Geren again in June 2008. (R. 225).

On January 6, 2009, Krosse saw Stephen Kroth, D.O. at Johnson City Family Care Center in Johnson City, New York (the "New York Clinic") to establish care as a new patient. (R. 316-20). He said that he had sprained his right knee a couple of weeks earlier, and he thought that he had recently injured his back in the area of his right lower ribs. (R. 316). He also wanted insulin and needles. *Id.* On examination, his right ribs were tender to palpation. (R. 319). Krosse was assessed with chronic uncomplicated and poorly controlled type II diabetes, and medications were prescribed. *Id.* He was also assessed with acute sprain/strain of his ribs and instructed to use over-the-counter pain relief medications. (R. 320).

Krosse had a follow-up appointment at the New York Clinic on January 22, 2009. (R. 312-15). His diabetes medications were adjusted. (R. 314). He was also screened for depression and found to not meet many criteria. *Id.* Krosse was seen again for diabetes follow-up on February 10, 2009 and March 6, 2009. (R. 297-300, 305-09). On March 14, 2009, Krosse was assessed with hypertension that was poorly controlled, and he was prescribed Lisinopril. (R. 292-96).

On May 22, 2009, Krosse presented for right knee pain that had started two weeks earlier. (R. 288-91). He was referred to physical therapy and instructed to take nonsteroidal anti-inflammatory drugs ("NSAIDs") for pain control. (R. 290). At a follow-up appointment on June 5, 2009, Krosse said that his knee was better, but his neck had a sharp pain that had started that day. (R. 284-87). On examination, his neck had full range of motion with mild tenderness. (R.

286).  His knee had full range of motion, and was "tender at middle of patella."  *Id.*  He was prescribed Flexeril, advised to continue with NSAIDs, and directed to follow-up on his referral to physical therapy.  *Id.*  On August 3, 2009, Krosse presented with situational stress due to his mother's hospitalization in Oklahoma, and he was prescribed clonazepam.  (R. 277-80).

On August 21, 2009, Krosse complained of foot pain in both feet.  (R. 273-76).  His diabetes and hypertension were described as being under good control.  (R. 275).  On September 24, 2009, Krosse was again doing well, and his medications were continued.  (R. 262-65).

On December 21, 2009, Krosse presented with increased symptoms of depression and anxiety, and he was prescribed Celexa.  (R. 249-51).  On January 6, 2010, Krosse presented with right rib pain, reporting that he had been diagnosed with two rib fractures at an emergency room. (R. 246-48).  The physician said the fractures were confirmed by x-ray, and on examination Krosse was tender over those ribs.  (R. 247).  Krosse was prescribed pain medications.  *Id.*

Krosse was seen for a diabetes follow-up appointment on April 2, 2010, and his glycemic control was described as "questionable."  (R. 240-45).  He was asked to closely monitor his blood sugar levels for one week for evaluation.  (R. 243).

Krosse saw Debra Paxton, D.O. at the New York Clinic on April 27, 2010 and was treated with osteopathic manipulation.  (R. 235-39).

On May 11, 2010, Krosse was seen at the New York Clinic for back pain.  (R. 231-34). On examination, Krosse had "posterior tenderness" of his spine, but normal range of movement, with slight pain on rotation.  (R. 233).  He had an area of tenderness on the right side around the T10 area.  *Id.*  He was assessed with sprain/strain of his ribs and instructed to continue heat, ice, and stretching.  *Id.*

Krosse was seen by Asim Maqsood, M.D., at Morton Comprehensive Health Services, Inc. (the "Morton Clinic") in Tulsa on October 11, 2010 to establish care as a new patient.  (R. 354-56).  Krosse's weight was 227.  (R. 355).  Assessments were benign essential hypertension, hyperlipidemia, and "poorly controlled" diabetes.  *Id.*  Dr. Maqsood ordered laboratory tests, and he prescribed Celexa and medications for diabetes and high blood pressure.  (R. 355-56).  At a follow-up appointment on November 2, 2010, the certified physician's assistant assessed anemia and continued the other previous assessments.  (R. 351-54).

Krosse was evaluated by Elka Serrano, M.D., at F&CS on November 16, 2010.  (R. 342-43).  On Axis I,[1] she assessed recurrent, moderate major depressive disorder, and she assessed Krosse's Global Assessment of Functioning ("GAF")[2] as 65/70.  (R. 343).  She increased the dosage of Celexa and added Trazodone for sleep.  *Id.*

On November 30, 2010, Krosse returned to Dr. Maqsood for follow-up of his lab results and also mentioned soreness in his low back after a fall the day before.  (R. 350-51).  On examination, there was no tenderness of the low back, and range of motion was intact.  (R. 351).  Assessments were anemia and poorly controlled diabetes.  *Id.*  It appears that Krosse was seen at the Morton Clinic on December 10, 2010 by Michael Opong-Kusi, D.O., but the computer record is incomplete and says that details were dictated.  (R. 349).  The record does state that Krosse was told to rest and use ice as needed and that an NSAID was prescribed.  *Id.*

---

[1] The multiaxial system "facilitates comprehensive and systematic evaluation."  *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

[2] The GAF score represents Axis V of a Multiaxial Assessment system.  *See* DSM IV at 32-36.  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning."  *Id.* at 32.  *See also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012).

Krosse returned to Dr. Serrano at F&CS on February 22, 2011, and she continued the diagnosis of major depressive disorder. (R. 447). She increased the dosage of Elavil to help with sleep and depression. *Id.* A document from F&CS reflects that Krosse discontinued services with them in 2011. (R. 442).

Krosse returned to Dr. Opong-Kusi at the Morton Clinic on April 6, 2011 with a complaint of chronic low back pain and a request for referral for manipulation. (R. 406-07). Krosse said that he had symptoms in his back, hip, and knee. (R. 406). On examination, Krosse had low back pain and multiple tender points in the sacral/lumbar region. (R. 407). Straight leg raising was negative. *Id.* Krosse ambulated with a slight limp. *Id.* Assessments were ankle joint pain, benign essential hypertension, hyperlipidemia, poorly controlled diabetes, and myalgia and myositis. *Id.* At a follow-up on April 19, 2011, Dr. Maqsood prescribed Flexeril and Tramadol while Krosse was waiting for a scheduled appointment with a pain specialist. (R. 404-05). A physician's assistant saw Krosse on May 6, 2011 because of continued pain in his right ankle after a normal x-ray. (R. 402). The physician's assistant explained that his symptoms were likely due to arthritis and that he should use ice and heat as tolerated, in addition to his NSAID. *Id.*

On May 9, 2011, Ashok Kache, M.D., evaluated Krosse as a new patient for his complaints of chronic mild to moderate back pain for 5 or 6 years. (R. 417-18). On examination, Dr. Kache found that Krosse had only mild outward tenderness in his lumbar spine. (R. 418). He had minimal tenderness in the gluteal muscles adjacent to the iliac crest, and there were no trigger points. *Id.* His gait was normal. *Id.* Dr. Kache's impressions were mechanical back pain syndrome and residual chronic pain of his right knee after injury. *Id.* He prescribed Mobic, Lortab, and Flexeril. *Id.*

7

Krosse saw Dr. Maqsood at the Morton Clinic  for follow-up of his diabetes and hypertension on June 8, 2011.  (R. 431-32).  At an appointment with Dr. Opong-Kusi on September 14, 2011, it was noted that Krosse had not been compliant with diet and medications.  (R. 424-26).  It was noted that examination of his lumbar spine and knee showed "abnormalities."  (R. 425).  Dr. Maqsood saw Krosse on October 11, 2011.  (R. 422-24).  Krosse returned to Dr. Maqsood on January 3, 2012 for follow-up, and Dr. Maqsood adjusted his medications.  (R. 421-22).

Krosse saw Mark Crouch, M.D. as a new patient on February 14, 2012.  (R. 456-58).  Assessments were uncontrolled diabetes, mixed hyperlipidemia, benign hypertension, and morbid obesity.  (R. 457-58).

Examining agency consultant Timothy W. Winter, D.O. completed a physical examination of Krosse on February 25, 2011.  (R. 370-76).  Krosse weighed 272 pounds and reported that he had gained 50 pounds in the previous six months.  (R. 370-71).  On examination, Krosse had decreased range of motion of the spine.  (R. 371).  Krosse had attended the examination with a cane, but Dr. Winter stated that without the use of assistive devices, Krosse's gait was stable.  *Id.*  He noted that Krosse moved easily about the examination room.  *Id.*  His assessments were low back pain; poorly-controlled diabetes; hypertension; high cholesterol; depression; flat feet with history of plantar fasciitis; osteoarthritis of the right knee; sleep disorder; and status post eye muscle surgery and tonsillectomy as a child.  (R. 371-72).  The accompanying Range of Joint Motion Evaluation Chart showed some limitation of back flexion, and hip flexion.  (R. 373).  The Backsheet also reflected reduced flexion of the back and noted pain.  (R. 376).  Straight leg raising was positive bilaterally.  *Id.*  Tenderness of both the cervical spine and lumbar spine was noted.  *Id.*

Nonexamining agency consultant Luther Woodcock, M.D., completed a Physical Residual Functional Capacity Assessment on March 24, 2011.  (R. 391-98).  Dr. Woodcock indicated that Krosse could occasionally lift or carry up to 50 pounds and frequently lift or carry up to 25 pounds.  (R. 392).  He found that, in an 8-hour workday, Krosse could stand and/or walk for about 6 hours and could sit for about 6 hours.  *Id.*  For narrative explanation, Dr. Woodcock reviewed Krosse's treatment for his diabetes in 2008 and his improved control in 2010.  *Id.*  His 2010 office visit for a 3-day onset of back pain was also noted.  *Id.*  An x-ray from 2009 showing mild degenerative joint disease of his right knee was noted.  *Id.*  Dr. Woodcock summarized Dr. Winter's consultative examination report.  (R. 392-93).  He also summarized Krosse's activities of daily living, stated there were "some limitations due to depression."  (R. 393).  Dr. Woodcock found no postural, manipulative, visual, communicative, or environmental limitations were established.  (R. 393-95).  On June 24, 2011, nonexamining agency consultant David M. Bailey, M.D. came to the same conclusions as Dr. Woodcock on a second Physical Residual Functional Capacity Assessment.  (R. 409-16).  Dr. Bailey summarized the May 9, 2011 office visit of Krosse with Dr. Kache as part of his narrative explanation for his findings.  (R. 410-11).

Agency examining consultant Michael D. Morgan, Psy.D. completed a mental status examination of Krosse on February 8, 2011.  (R. 362-67).  Dr. Morgan's impression on Axis I was anxiety disorder not otherwise specified, and he scored Krosse's GAF as 76-80.  (R. 365). In a paragraph under the title "prognosis," Dr. Morgan noted that Krosse's anxiety was related to "unresolved issues of origin, living with chronic pain, diabetes, being unemployed and ongoing financial difficulties."  *Id.*  Dr. Morgan stated that Krosse could achieve a higher level of functioning within one year with appropriate mental health treatment.  *Id.*

Agency nonexamining consultant Janice B. Smith, Ph.D., completed a Psychiatric Review Technique form dated March 15, 2011.  (R. 377-90).  For Listing 12.04, Dr. Smith noted two symptoms of depressive syndrome.  (R. 380).  For Listing 12.06, Dr. Smith noted anxiety. (R. 382).  For the "Paragraph B Criteria,"[3] checkmarks indicated that Krosse had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation.  (R. 387).  In the "Consultant's Notes" portion of the form, Dr. Smith briefly summarized Krosse's 2010 visit with Dr. Serrano.  (R. 389).  She also briefly summarized Dr. Morgan's report, and Krosse's activities of daily living.  *Id.*  Dr. Smith stated that there was no evidence of a severe, disabling mental impairment which would prevent Krosse from working. *Id.*  She said that Krosse's "mental allegations" were nonsevere.  *Id.*

## Procedural History

Krosse filed an application on November 22, 2010, seeking disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (the "Act").  (R. 129-35). Krosse alleged onset of disability as September 3, 2009.  (R. 129).  The application was denied initially and on reconsideration.  (R. 69-73, 75-77).  A hearing before ALJ Deborah L. Rose was held April 10, 2012.  (R. 25-62).  By decision dated May 25, 2012, the ALJ found that Krosse was not disabled.  (R. 11-20).  On March 13, 2013, the Appeals Council denied review of the

---

[3] There are broad categories known as  the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment.  The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

ALJ's findings.  (R. 1-4).  Thus, the decision of the ALJ represents the Commissioner's final

decision for purposes of this appeal.  20 C.F.R. § 404.981.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability

claim.  20 C.F.R. § 404.1520.[4]  *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009)

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not

disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084 (citation

and quotation omitted).

---

[4] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work.  20 C.F.R. § 404.1520.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Wall*, 561 F.3d at 1052 (quotations and citations omitted).  Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  *Id.*

### Decision of the Administrative Law Judge

The ALJ found that Krosse met insured status requirements through September 30, 2013.  (R. 13).  At Step One, the ALJ found that Krosse had not engaged in any substantial gainful activity since his asserted onset date of September 3, 2009.  *Id.*  At Step Two, the ALJ found that Krosse had severe impairments of diabetes, degenerative joint disease, and obesity.  *Id.*  The ALJ found that Krosse's medically determinable mental impairments were nonsevere.  (R. 14-15).  At Step Three, the ALJ found that Krosse's impairments did not meet a Listing.  (R. 15).

The ALJ determined that Krosse had the RFC to perform the full range of medium work, with no other limitations.  *Id.*  At Step Four, the ALJ found that Krosse was able to perform past relevant work.  (R. 19).  Therefore, the ALJ found that Krosse was not disabled from September 3, 2009 through the date of her decision.  (R. 20).

### Review

Krosse asserts three arguments before this Court.  First, he states that the ALJ did not properly consider his nonsevere mental impairments in determining his RFC.  Plaintiff's Opening

12

Brief, Dkt. #15, pp. 6-7.  Second, he asserts that the ALJ gave "undue weight" to the opinion evidence of Dr. Woodcock, the nonexamining agency consultant.  *Id.* at 7-9.  Third, Krosse asserts that the ALJ failed to resolve discrepancies in the record.  *Id.* at 9-10.  Regarding the issues raised by Krosse, the Court finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements.  Thus, the ALJ's decision is **AFFIRMED**.

## Nonsevere Mental Impairments

The undersigned finds Krosse's argument regarding his nonsevere mental impairments to be unpersuasive.  The ALJ stated at Step Two of her analysis that Krosse's mental impairments did not cause more than minimal limitation in his ability to perform basic mental activities.  (R. 14).  She considered the Paragraph B Criteria in some detail and explained the evidentiary basis for her finding for each criteria that Krosse's limitations were only "mild."  *Id.*  Later in her decision, the ALJ explained that Krosse's history of treatment for his alleged mental impairments was inconsistent with a claim that those impairments were disabling.  (R. 19).  She noted that Krosse had limited contacts with mental health practitioners at F&CS and had discontinued services there.  *Id.*

In response to the ALJ's finding that Krosse's mental impairments were nonsevere and her implicit decision that he had no limitations arising from those nonsevere impairments that should be included in the RFC determination, Krosse argues repeatedly that the ALJ "failed" to consider his nonsevere mental impairments and failed to include any mental impairments in her RFC determination.  Plaintiff's Opening Brief, Dkt. #15, pp. 6-7.  Contrary to Krosse's argument, the ALJ was not required to find that his nonsevere depression resulted in limitations in his ability to do work-like functions.  *See, e.g., Alvey v. Colvin*, 536 Fed. Appx. 792, 795 (10th Cir. 2013) (unpublished) (affirming in part because there was "no substantial evidence that

would allow a reasonable administrative factfinder to include any mental limitations" in the claimant's RFC). Further, the Psychiatric Review Technique form completed by nonexamining agency consultant Dr. Smith, including her statement that there was no evidence of a severe, disabling mental impairment that would prevent Krosse from working, is substantial evidence supporting the ALJ's omission of any mental limitations in her RFC determination. (R. 389); *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007). The ALJ did not err in her consideration of Krosse's nonsevere mental impairment.

### Dr. Woodcock's Opinion Evidence

Krosse appears to be under a fundamental misunderstanding of the ALJ's obligation to analyze opinion evidence. The first sentence of this section of his brief states: "Where conflicting opinions exist between a consulting physician and a treating physician, the burden falls on the shoulders of the ALJ to determine the validity of each position." Plaintiff's Opening Brief, Dkt. #15, p. 7. Krosse cites to a Ninth Circuit opinion for this proposition, but this statement is consistent with the approach of this circuit as well. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (in general the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight). Here, however, Krosse does not assert that there was any treating physician opinion or any examining physician opinion that should have been given precedence over the opinion of Dr. Woodcock. Plaintiff's Opening Brief, Dkt. #15, pp. 7-8. He does not identify one single "conflicting opinion" that the ALJ should have considered before allocating great weight to the opinion evidence of Dr. Woodcock. *Id.*

The Tenth Circuit in *Cowan v. Astrue,* 552 F.3d 1182, 1188-89 (10th Cir. 2008) explained that a "true medical opinion" was one that contained a doctor's "judgment about the

nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform."  Thus, the court found that a statement by a treating physician that the claimant had a stroke "and I feel he may never return to work" was not a true medical opinion.  *Id.  See also Martinez v. Astrue,* 316 Fed. Appx. 819, 822-23 (10th Cir. 2009) (unpublished) (ALJ did not need to provide specific legitimate reasons for rejecting portion of treating physician's letter that contained only generalized statements).

Here, in his Reply Brief, Krosse states that the treating records contain "notes detailing [Krosse's] impairments, including his mental health impairments of anxiety and depression." Plaintiff's Reply Brief, Dkt. #17, p. 2.  As *Cowan* and *Martinez* explain, treating notes that describe impairments are not opinion evidence; instead, the notes must actually address the functional limitations of the claimant in order to be opinion evidence.  The Court has found no statements in any treating records in the administrative transcript that constitute opinion evidence, and, as noted, Krosse has not cited to any.  *See Gilbert v. Astrue*, 231 Fed. Appx. 778, 782 (10th Cir. 2007) (unpublished) ("In the absence of essential references to the record in a party's brief, the court will not 'sift through' the record to find support for the claimant's arguments.") (further quotation and citation omitted).  In Krosse's case, there was simply no treating opinion evidence for the ALJ to consider.

Moreover, the ALJ was entitled to rely opinion Dr. Woodcock's assessment as substantial evidence.  *See Flaherty*, 515 F.3d at 1071 (nonexamining consultant's opinion was an acceptable medical source which the ALJ was entitled to consider and which supported his RFC determination).  The ALJ did not commit any reversible error regarding opinion evidence.

**Credibility Assessment**

Krosse's third argument appears to be that the ALJ erred by noting inconsistencies in his testimony without "resolving" those inconsistencies.  Plaintiff's Opening Brief, Dkt. #15, pp. 9-10.  Credibility determinations by the trier of fact are given great deference.  *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002).  In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence.  *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.  "[C]ommon sense, not technical perfection, is [the] guide" of a reviewing court.  *Keyes-Zachary*, 695 F.3d at 1167.

First, the Court finds that the ALJ did, indeed, resolve the factual questions posed by Krosse's case.  She determined Krosse's RFC, and she therefore rejected all of Krosse's testimony that claimed that he had impairments that were more severe than reflected by that RFC.  She stated that Krosse's statements were "not credible to the extent they are inconsistent with" her RFC determination.  (R. 18).  She then gave several examples of inconsistencies which she found justified a finding that Krosse was not completely credible.  She found his testimony that he had attended special education classes to be inconsistent with his completion of course work at Tulsa Community College.  *Id.*  She found that medical records that stated that Krosse's knee pain had been alleviated with warm compresses indicated that his knee pain was not at a level that was disabling, as he asserted.  *Id.*  She said that the activities Krosse described in a

function report were not consistent with back pain that was claimed to be disabling.  *Id.*  She contrasted his claims of disabling back pain with the treating records of Dr. Kache.  *Id.*  She found that if Krosse suffered from pain that was severe enough to be disabling, he would have made more attempts to obtain treatment for his back and knee conditions.  (R. 18-19).

These were all proper examples that supported a finding that Krosse was less than fully credible.  Findings that subjective complaints are inconsistent with reported activities or with objective medical evidence are legitimate reasons that support an adverse credibility assessment.  *Newbold v. Colvin*, 718 F.3d 1257, 1267 (10th Cir. 2013).  Failure of a claimant to be diligent in seeking treatment for allegedly disabling impairment is a legitimate factor supporting an adverse credibility assessment.  *Qualls v. Apfel*, 206 F.3d 1368, 1372-73 (10th Cir. 2000).  Krosse appears to be arguing that the ALJ had an obligation to do more, but that is simply not true.  She adequately resolved all conflicts by determining Krosse's RFC and by finding that his subjective complaints that went beyond the limitations she found were not credible.  The ALJ's credibility assessment was properly supported by legitimate reasons that were linked to substantial evidence.  The Court therefore finds that the ALJ's credibility assessment was sufficient, and the ALJ's decision is hereby **AFFIRMED**.

## Conclusion

The decision of the Commissioner is supported by substantial evidence and complies with legal requirements.  The decision is **AFFIRMED**.

Dated this 3rd day of April 2014.

_____

Paul J. Cleary
United States Magistrate Judge